IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALBERT GONZALEZ,                                    Civ. No. 08-6236-HO
                                                    (Lead)
            Plaintiff,

                                                    Civ. NO. 08-6240-HO
      v.                                            (Consolidated)

                                                    ORDER

CENTRAL ELECTRIC COOPERATIVE,
INC., et al.,

            Defendants.


                        Introduction

      These consolidated cases are practically identical.   This

order refers to documents filed in the lead case, civil number

08-6236-HO.

      Plaintiff Albert Gonzalez is the former chief executive

officer and president of defendant Central Electric Cooperative,

Inc. (CEC).   The second amended complaint alleges claims under

the Employee Retirement Income Security Act, and claims for

breach of contract, unpaid compensation and defamation.  CEC,
current and former CEC board members and several ERISA plans are
named as defendants.  The answer to the second amended complaint
contains counterclaims for breach of fiduciary duty, fraud,
breach of contract and accounting.  The fraud claim names Sue
Gonzalez as a third party defendant.  Plaintiff and third party
defendant each filed a reply asserting a counterclaim of
retaliation in violation of Section 659A.230 of the Oregon
Revised Statutes.  A raft of motions, some dispositive, are
before the court.

    For the reasons explained below, plaintiff and counterclaim
defendant's "counterclaims" are procedurally improper; plaintiff
and counterclaim defendant are not entitled to sanctions,
including disqualification of defense counsel; the court does not
strike evidence, but does not permit a party to create a disputed
issue of material fact based on inadmissible evidence;
counterclaim defendant is entitled to judgment as a matter of law
on defendants' counterclaims; plaintiff is entitled to judgment
as a matter of law on defendants' counterclaims for fraud, breach
of contract and accounting; disputed issues of material fact
otherwise preclude judgment as a matter of law in favor of
plaintiff or defendants; plaintiff is not entitled to a
protective order for violation of the Video Privacy Protection
Act; and certain affirmative defenses raised by plaintiff against
defendant's counterclaims fail as a matter of law.

<u>Plaintiff and Counterclaim Defendant's Motion to Disqualify
Defense Counsel [#195]</u>

The court disqualified Martin Hansen and the law firm of
Francis Hansen & Martin LLP as counsel for CEC by order dated
October 23, 2008.  Order at 5-6.  Plaintiff and counterclaim
defendant now move to disqualify defense counsel Lane Powell PC
on the grounds that plaintiff and counterclaim defendant recently
learned that Hansen engaged Lane Powell PC as secret co-counsel
on August 1, 2008, Lane Powell PC concealed its past work on the
case when it represented itself to the court as new counsel in
November 2008, and Hansen continued to consult and advise CEC on
the case after disqualification.  In addition to
disqualification, plaintiff and counterclaim defendant seek
sanctions in the form of dismissal of defendants' counterclaims
and default judgment as to liability on plaintiffs' claims.

The parties rely on conflicting authority for determining
when substitute counsel should be disqualified.  They point to no
binding authority in this jurisdiction and the court finds none.
The court will follow the approach utilized by the Supreme Court
of Texas.  A party seeking disqualification must first
demonstrate that there were substantive conversations between
disqualified counsel and co-counsel, joint preparation for trial
by those counsel, or the apparent receipt by co-counsel of
confidential information.  <u>In re American Home Products Corp.</u>,
985 S.W.2d 68, 81 (Tex. 1998) (citing to, <u>inter alia</u>, <u>Fund of</u>

3 - ORDER

Funds, Ltd. v. Arthur Anderson & Co., 567 F.2d 225, 235-46 (2nd
Cir. 1977); Paul R. Taskier, Alan H. Cosper, Vicarious
Disqualification of Co-Counsel Because of "Taint", 1 Geo. J.
Legal Ethics 155, 158 (1987)).  A rebuttable presumption then
arises that disqualified counsel shared confidential information
with co-counsel.  Id.

> The party resisting disqualification of co-counsel may
> rebut this presumption by providing probative and
> material evidence that the tainted person . . . did not
> disclose confidential information of his adversary.
> [A] party seeking disqualification is placed somewhat
> at a disadvantage in attempting to rebut such evidence
> because of the attorney-client, work product, and other
> privileges.  But a party seeking disqualification
> should not be permitted to broadly pierce privileges to
> probe whether its confidential information was actually
> revealed.  A party seeking disqualification is entitled
> to determine, however, whether co-counsel have jointly
> prepared the case for trial or whether they have had
> substantive discussions regarding the case, but without
> inquiring into the substance of the work that has been
> done or of discussions between co-counsel.

Id.

Lane Powell PC shareholder Lorne Dauenhauer states in his
June 28, 2009 declaration that he, and therefore Lane Powell PC,
was retained by CEC general counsel Martin Hansen on or about
August 1, 2008, to represent and advise CEC with respect to
evaluation of several of the ERISA plans sponsored by CEC, in
connection with this lawsuit.  Dauenhauer states that he was
specifically engaged to assist CEC and Francis Hansen & Martin
LLP in preparing affirmative defenses to the ERISA causes of
action, and that he was also asked by Hansen and CEC President

4 - ORDER

Dave Markham to review several CEC executive compensation and other employee benefit plans for compliance with ERISA and the Internal Revenue Code of 1986.  Dauenhauer states that the compliance review work was independent of the lawsuit. Dauenhauer states that he did not consider himself or Lane Powell PC to be co-counsel, and he is not a trial lawyer and is not admitted to practice in the Oregon federal district court.  The terms of engagement letter states that CEC general counsel Hansen engaged Lane Powell PC "to represent the Company in connection with ERISA issues underlying Mr. Gonzalez' [sic] claims against the Company and to assist in defending the Company against such claims."  Dauenhauer Decl., ex. A.  The letter is signed by Martin Hansen as general counsel for CEC.

Dauenhauer further states that he expended 10.3 hours between July 31 and August 13, 2008 reviewing some of the benefit plans at issue and preparing suggested revisions for the answer filed by CEC on August 15, 2008.  Dauenhauer states he initially spoke with Hansen, and thereafter Chris Manfredi of the Frances, Hansen & Martin LLP firm, that no one provided him with confidential information about Gonzalez, that all he knew of Gonzalez's alleged involvement with NUS he gleaned from the proposed answer he reviewed on behalf of CEC, and that he first learned of the 2006 state court case that led to the October 23, 2008 disqualification order from that order.  Lane Powell PC

5 - ORDER

shareholder William Patton states that he reviewed the complaint and a draft answer at the request of Dauenhauer, that he expended 5.6 hours doing so, and that he spoke to and received emails from no one at Frances Hansen & Martin.  Nor were emails forwarded to him from Dauenhauer.

In a June 29, 2009 declaration referenced in his July 21, 2009 declaration, Dauenhauer states as follows.  Prior to October 2008, Hansen and CEC president Markham asked Dauenhauer to review several executive compensation plans for compliance with ERISA and the Internal Revenue Code of 1986, as amended, and that the work was independent of the lawsuit.  Dauenhauer recommended to Markham that the Retiree Medical Coinsurance Plan be amended.  He provided a draft document to Markham on January 9, 2009 at Markham's request, and he thereafter participated in a phone conference with Markham and Hansen concerning the draft.  Allison Huycke of Frances Hansen & Martin LLP prepared a draft resolution for CEC's board based on Dauenhauer's written proposals, and Dauenhauer reviewed and marked up the draft for Ms. Huycke. CEC's board approved the changes in late January 2009.  After February 1, 2009, Markham asked Dauenhauer to review Gonzalez's requests for benefits and appeals under several ERISA plans, and Dauenhauer did so.  Dauenhauer did not discuss his review of the claims and appeals with anyone at Frances Hansen & Martin LLP. Dauenhauer presented his review at the May 21, 2009 CEC board

meeting.  Hansen did not participate in the review.  Finally,

> [Dauenhauer's] representation of CEC [and] contact with
> the Francis Hansen & Martin LLP law firm has [at] all
> times been limited to ERISA matters.  Although over
> time [Dauenhauer] became aware of the existence of
> counter-claims and other legal disputes between CEC and
> Mr. Gonzalez, [he] gained such awareness through
> reading pleadings and other court documents filed in
> this action and not through any discussions between
> [he] and anyone at Mr. Hansen's firm.

Dauenhauer Decl., dated June 28, 2009.

Plaintiff and counterclaim defendant find Dauenhauer's statements to conflict with those of Lane Powell PC attorney David Hosenpud in support of CEC's motion for extension of deadlines filed November 21, 2008, and with the February 9, 2009 deposition testimony of CEC president Dave Markham.  Hosenpud stated, "[c]ounsel for defendant has recently substituted into the case and additional time is needed to gather information and complete discovery."  Pl's ex. 5, ¶ 3.  Markham stated in the presence of defense counsel that CEC retained Lane Powell PC "shortly after Mr. Hansen was removed from the case."  Pl's ex. 7 at 2 (224:15-18).  Markham further stated that the board of directors chose the Lane Powell PC firm.  Id. at 3 (227:7-12).  Plaintiff and counterclaim defendant further contend that Markham's deposition testimony is inconsistent with his June 28, 2009 declaration.  Markham declared:

> It is within my discretion as president and CEO of CEC
> to retain counsel.  In my experience during the entire
> time I have been president . . ., the CEC Board has
> never made a decision to retain counsel on any specific

7 - ORDER

legal issue or litigation.  That task is among my
responsibilities.  After Mr. Hansen's disqualification
in October 2008, I informed the CEC Board that Lane
Powell PC would take over CEC's representation in this
case.  The CEC Board was not aware of Mr. Dauenhauer's
involvement before October 2008.

Markham Decl. dated June 28, 2009, ¶ 14.

In a subsequent declaration, Markham states that "[t]he CEC
Board was involved in the transition of this case to Lane Powell
PC because it was appropriate to advise it concerning the Hansen
firm's disqualification and to see if there was any objection to
Mr. Maloney and Lane Powell taking over from the Hansen firm."
Markham Decl. date July 21, 2009, ¶ 5.

Plaintiff and counterclaim defendant contend that Lane
Powell PC and CEC should have disclosed Lane Powell PC's
involvement in the case in time for the court to determine
whether Lane Powell PC could properly represent CEC following the
disqualification of Hansen's firm.  Plaintiff and counterclaim
defendant further contend that Lane Powell PC's pre-
disqualification advice is "inextricably interwoven in the
litigation" because Lane Powell PC attorney Dauenhauer worked
with Hansen on the affirmative defenses to plaintiff's ERISA
claims, including the tenth affirmative defense of setoff for
plaintiff's breach of fiduciary duties, which plaintiff contends
is directly linked to defendants' counterclaim of fraud based on
plaintiff's alleged self-dealing through the award of meter-
reading contracts to NUS, an issue in the 2006 state court

8 - ORDER

litigation.  Plaintiff and counterclaim defendant therefore
contend that Lane Powell PC should be disqualified.

The first question to address is the relationship between
Frances Hansen & Martin LLP and Lane Powell PC.  Although Lane
Powell PC did not appear as trial counsel until November 21,
2009, the court finds that Lane Powell PC served as co-counsel to
CEC, and was not merely the agent of Frances Hansen & Martin LLP.
The agreement to represent CEC against Gonzalez's ERISA claims is
between CEC and Lane Powell PC, not between Frances Hansen &
Martin and Lane Powell PC.  Dauenhauer Decl., ex. A.

Next, substantial evidence supports a finding that Frances
Hansen & Martin LLP and Lane Powell PC attorneys engaged in joint
preparation for trial on the ERISA claims, creating a rebuttable
presumption that Frances Hansen & Martin LLP attorneys shared
confidential information about plaintiff with Lane Powell PC
attorneys.  Defendants effectively rebut the presumption,
however, with the statements of Lane Powell PC attorneys that
Frances Hansen & Martin LLP attorneys conveyed no confidential
information about plaintiff, and that they learned nothing of
Gonzalez's alleged relationship with NUS other than what is
alleged in the pleadings.

Based on the foregoing, plaintiff and counterclaim
defendant's motion to disqualify Lane Powell PC is denied.  If it
later appears that Lane Powell PC attorneys are using

confidential information against plaintiff, then plaintiff is
entitled to obtain the source of the information.  In re American
Home Products, Corp., 985 S.W.2d at 81-82.

<u>Plaintiff's Motion to Dismiss Counterclaims and Strike
Affirmative Defenses [#122]</u>

Plaintiff seeks an order dismissing defendants'
counterclaims and affirmative defenses as a sanction for
defendants and defense counsel's alleged concealment of the
involvement of disqualified counsel Martin Hansen.  Plaintiff
points out that the court's order after <u>in camera</u> review of
documents indicates that Hansen communicated about the case with
Lane Powell PC attorneys after disqualification.  Plaintiff
complains that CEC retained its counterclaims and defenses
premised on the alleged relationship between plaintiff and NUS.
Plaintiff further complains that CEC continues to permit Hansen
to attend CEC board meetings, Hansen directed CEC to take custody
of plaintiff's personal property, including his ERISA plan
documents, Hansen was involved in CEC refusing or suspending plan
benefits to plaintiff and Hansen's ongoing involvement in the
case is evident from minutes of a January 2009 emergency meeting
of the CEC board in which Hansen introduced a resolution amending
CEC's ERISA plans, allegedly in order to deny benefits to
plaintiff.  Plaintiff complains that his efforts to discover
Hansen's continuing involvement in this case have been frustrated
by defense counsel's instructions to CEC officials not to answer

10 - ORDER

plaintiff's counsel's questions regarding communications with
Hansen.

Defendants respond that the genesis of their counterclaims
and affirmative defenses related to NUS is a conversation between
Dianne Wooten of NUS and CEC president Dave Markham, which
spurred Markham to direct Hansen to prepare and prosecute the
counterclaims and defenses, that the conversation occurred prior
to Hansen's disqualification.  Defendants contend that this
information is independent of the 2006 litigation.  Defendants
maintain that Lane Powell PC provided advice on ERISA matters,
which led CEC's board to amend the ERISA plans.

As discussed above, defendants have so far rebutted the
presumption that Hansen communicated confidential information
concerning plaintiff to Lane Powell PC attorneys.  Plaintiff may
not breach the attorney client privilege until it appears that
confidential information has been disclosed.  Plaintiff's motion
for sanctions is denied without prejudice to plaintiff to file
such a motion if new evidence surfaces that Lane Powell PC
attorneys learned confidential information about plaintiff from
disqualified counsel.

<u>Defendants' Motion to Dismiss Plaintiff and Counterclaim</u>
<u>Defendants' Counterclaims for Retaliation in Violation of Section</u>
<u>659A.230 [#192]</u>

In their respective replies to the second amended complaint,
plaintiff and counterclaim defendant allege in "counterclaims"

11 - ORDER

that defendants asserted counterclaims against them because
plaintiff filed this lawsuit, in violation of section 659A.230 of
the Oregon Revised Statues.  Rule 7(a) of the Federal Rules of
Civil Procedure does not permit plaintiff and counterclaim
defendant to include "counterclaims" in replies.  Nor does it
permit the filing of a reply to a complaint without leave of
court.  Defendants' motion to dismiss these counterclaims is
granted.  Although the counterclaims are dismissed, the court
construes the replies as answers to defendants' counterclaims
and, so construed, considers the affirmative defenses alleged
therein.

### Plaintiff's Motion to Strike Paragraph 26 of the June 15, 2009 Declaration of David Hosenpud [#164]

David Hosenpud, attorney for defendants, states in support
of defendants' motion for summary judgment,

> Lane Powell PC has received no strategic or tactical
> guidance regarding the prosecution of this case from
> CEC's former counsel, Martin Hansen.  Further, Lane
> Powell PC has not reviewed any information concerning
> Mr. Hansen's former representation of plaintiff in
> 2006, with the exception of information contained
> within the pleadings and exhibits in connection with
> plaintiff's motion to disqualify.

Hosenpud Decl. dated June 15, 2009, ¶ 26.  Plaintiff moves to
strike this portion of Hosenpud's declaration on the grounds that
it is vague, non-specific and conclusory, and because it consists
of evidence regarding an issue on which defendants repeatedly
claimed the attorney-client privilege.

12 - ORDER

Striking the paragraph would not impact plaintiff's affirmative defense to defendants' counterclaims.  Through the declarations of Hosenpud, Patton and Dauenhauer, discussed above, defendants have rebutted the presumption that confidences that Hansen might be expected to harbor from his prior representation of plaintiff should be imputed to Lane Powell PC.  As noted, if it later appears that such confidences have been disclosed to Lane Powell PC, plaintiff will be entitled to discover the source of the confidences and the court may then consider sanctions.  Plaintiff's motion to strike paragraph 26 of the June 15, 2009 Hosenpud declaration is denied.

<u>Plaintiff's Motion to Strike Certain Declarations in Whole or in Part [#200]</u>

Plaintiff moves to strike the following declarations filed by defendants in support of their motion for summary judgment and partial summary judgment.  The court will not strike evidence, but it has considered the objections noted in plaintiff's papers.  The court will not permit a party to create a genuine issues of material fact based on inadmissible evidence.  The challenged evidence is considered in turn.

I.  <u>Declaration of Linda Johnson</u>

The witness, owner of Cascade Bookkeeping, Inc., would testify based on her review of documents, including the deposition of Sue Gonzalez, that Summit Accounting provided excessive bookkeeping services, at excessive rates, to NUS.

13 - ORDER

Plaintiff moves to strike the declaration pursuant to Rules 401, 402, 403, 601, 602 701, 702 and 703 of the Federal Rules of Evidence.  Plaintiff discusses only Rule 702, however.  Plaintiff argues that Johnson is not qualified by education or experience to render an expert opinion on these matters.  Plaintiff provided an October 11, 2006 letter from Ridgewater Homeowner's Association (HOA) to members explaining that an increase in dues results from extraordinary bookkeeping expenses charged by Cascade Bookkeeping and that the board of the HOA terminated the services of Cascade Bookkeeping.

As defendants point out, Johnson states that her company provides bookkeeping and accounting services to 42 small companies and 20 HOAs, the services include payroll, accounts payable and receivable, production of financial statements and consulting, and based on her experience, Johnson understands the range of bookkeeping services required by small business and the types of administrative support typically provided to such businesses, and the relevant community rates charged for the services Summit Accounting claims to have provided to NUS.  In a supplemental declaration submitted with defendants' reply, Johnson states that she took MBA level accounting classes at the University of Washington in 1986.  She further states that in her position at Cascade, she supervises and verifies "the work needed to be performed" regarding the services described in her initial

declaration, to ensure that the work is done properly and in a cost efficient manner.  She states that in assessing the performance of her employees, she examines "the nature of the work performed . . ., the amount of time it takes to perform tasks, and the charges made to our clients."  She states that this work is similar to what she has done to evaluate the work Sue Gonzalez claims to have performed on behalf of NUS.  Finally, Johnson states that her former business partner Bill Friedman performed the work for Ridgewater HOA before she joined Cascade Bookkeeping.

Plaintiff's objection is overruled.  The court considers Johnson's declaration at the summary judgment stage as evidence that Summit Accounting billed NUS for excessive services at excessive rates.

## II.   Declaration of Lorne Dauenhauer

Plaintiff challenges portions of Dauenhauer's declaration. Plaintiff argues that Dauenhauer is not competent to testify as he does in paragraph 6(a) that he recommended changes to CEC benefit plans in January 2009 in order to conform to long-standing administrative practice because his relationship with CEC commenced on August 1, 2008, and such testimony is necessarily based on hearsay.  The witness explains why he made recommendations.  The hearsay proves the witnesses' state of mind.  The objection to paragraph 6(a) is overruled.

Plaintiff next objects to the witness's testimony in paragraph 6(c) stating what the Retiree Medical Coinsurance Plan permits.  Matters of plan interpretation are for the court.  The objection to paragraph 6(c) is sustained.

Plaintiff raises the same objection with respect to paragraph 10.  The witness states that his plan interpretation is the basis for his recommendation to amend the plan.  The testimony is not objectionable on the basis that the witness is usurping the court's function of interpreting the plan.  Rather, the witness explains why he took action.  The objection to this statement is overruled.

Plaintiff next argues that paragraph 12 is hearsay.  The witness states that he understands that the board based its resolution on his recommendations as presented to the board by CEC president Markham at the January 15, 2009 board meeting. Defendant correctly points out that Markham and Hansen testify that this occurred.  Dauenhauer's statement is hearsay if offered to prove that Markham presented a resolution based on Dauenhauer's recommendations.  The objection to paragraph 12 is sustained.

Plaintiff next objects that sentence two of paragraph 14 is hearsay.  The witness states, "It is my understanding that the board's decision to amend the RMCP was based entirely on my recommendations."  Defendant argues that Dauenhauer's statement

16 - ORDER

is a logical conclusion based on a review of the final approved board resolution, and the fact appears elsewhere in the record unchallenged.  The fact appears in paragraph 16 of the Markham declaration.  Dauenhauer's statement is hearsay, however.  In the first sentence of the paragraph, Dauenhauer states that Markham told him that the board approved and adopted his recommendations.  Dauenhauer does not state that he reviewed the final resolution.  The objection to sentence two of paragraph 14 is sustained.

Plaintiff argues that exhibit A to Dauenhauer's declaration is hearsay.  According to Dauenhauer,

> Exhibit A is a true and accurate copy of a spreadsheet showing former CEC employees who are receiving benefits under the RMCP and those who are not receiving those benefits.  This information was reviewed by the CEC Board of Directors in connection with Mr. Gonzalez' claim for benefits under the RMCP.

Dauenhauer Decl., ¶ 15.  Dauhauer provides no foundation for the exhibit.  The objection to exhibit A of the Dauenhauer declaration is sustained.

III.  <u>Declaration of Jonathon Howell</u>

The witness would testify regarding audits he performed of Lightspeed Networks, Inc., a CEC affiliate or subsidiary, and about generally accepted accounting practices.  Plaintiff argues that he is not qualified as an expert.  The witness is an auditor, CPA and shareholder in DiLorenzo & Company, PC.  In a supplemental declaration, the witness states that he earned a post-baccalaureate degree in accounting in 1989 and masters in

17 - ORDER

taxation in 1992, both from Portland State University.  He states that he worked in public accounting from February 1988 to the present, he obtained his CPA certificate in August 1990, he has conducted approximately 150 audits, and he is knowledgeable about accounting rules, regulations, generally accepted accounting principles and practices, and generally accepted auditing standards that govern his profession.  This witness's declarations are accepted for summary judgment purposes.  The objection to this evidence overruled.

IV.  <u>Declaration of Martin Hansen</u>

Citing to Rules 401, 402, 403, 601 and 602 of the Federal Rule of Evidence, plaintiff objects to certain paragraphs of the declaration of Martin Hansen in which Hansen interprets the October 23, 2008 disqualification order and minutes of the January 23, 2009 meeting of the CEC board.  Defendants do not respond to this objection.  The court interprets its order and the board meeting minutes.  The objection to the challenged paragraphs of this declaration are sustained.

V.  <u>Declaration of William Keaton</u>

Plaintiff objects to portions of CEC board member William Keaton's declaration.  Plaintiff objects to Keaton's statement that plaintiff was indignant and upset because Keaton is not competent to testify to those emotions.  The objection is sustained.  William Keaton may testify about his observations.

Plaintiff objects to paragraphs 6 and 11 because they state a hypothetical and state what other board members and the board would have done.  Keaton states that if he, the board or any board member would have known that plaintiff lied about his involvement with NUS, Keaton, every board member and the board would not have authorized Hansen to represent plaintiff in the 2006 lawsuit alleging that CEC employees falsely alleged that plaintiff had an ownership interest in NUS.  The statements are objectionable, except to the extent Keaton speaks for himself.  The evidence is relevant to defendants' fraud counterclaim on the issues of the board's reliance on plaintiff's statements and damages.  The objection is sustained to the extent this witness speaks for others about matters he has not observed.

VI.  <u>Declaration of Thomas Sayeg</u>

The witness, former general counsel to CEC, states that in 2003 he interviewed plaintiff and Marvin and Deanna Wooten regarding anonymous employee complaints that plaintiff had an ownership interest in NUS.  The witness states that these individuals denied that plaintiff has an interest in NUS, and that if they had qualified their answers, the witness would not have concluded as he did in findings presented to CEC's board that plaintiff does not have an ownership interest in NUS.  Plaintiff argues that testimony based on hypothetical facts is speculative and inadmissible.  This evidence is relevant to

defendants' fraud counterclaim to prove that CEC relied on plaintiffs' representations.  As discussed below, however, defendants' fraud counterclaim fails to state a claim upon which relief may be granted.  The objection to this evidence is therefore sustained.

VII.   Declarations of Dave Sabala, John Gerstenberger, & Steven Eldridge

The witnesses, members of the board of directors of LS Networks, Inc., state that they did not know that a change in a depreciation schedule recommended by plaintiff had the potential to personally benefit plaintiff.  They further state that if they personally stood to gain from a change in bookkeeping methodology, they believe it would be inappropriate and unethical to fail to disclose the fact to the board.  Plaintiff objects to this testimony as improper speculation.  The testimony appears to be offered in support of defendants' claim for breach of fiduciary duty.  The witnesses do not demonstrate knowledge of fiduciary obligations.  The objection to this evidence is sustained.

VIII.   Paragraph 4 of Declaration of Steve Eldridge

Plaintiff objects to this LS Networks board member's testimony that the board did not have strong feelings about plaintiff's suggestion to apply the depreciation schedule retroactively, on the basis that Eldridge is not competent to testify as to board member feelings.  The witness can testify

about his observations.   The objection is sustained.

IX.   <u>Declaration of Connie Gunterman</u>

The witness, a CEC human resources manager, states that according to CEC's records, CEC employment of certain employees commenced and terminated on certain dates, and CEC does not pay medical insurance premiums for these employees.  Plaintiff objects that the witness does not provide a foundation for her testimony, or for admission of the cited CEC records under the business records exception to the hearsay rule.  The objection is overruled.  The witness is an HR manager and the information is of the type that would be found in personnel files.  The witness states that she is knowledgeable about the facts to which she testifies.  Defendant can likely establish a foundation for these records at trial.

Based on the foregoing, plaintiff's motion to strike [#200] is denied.

<u>Plaintiff's Motion For Protective Order & In Limine [#156]</u>

Plaintiff moves for an order

restricting defendants from any use of records of video
tape rentals which were obtained contrary
to the provisions of 18 U.S.C. § 2710.  Plaintiff
further requests that the court enter an order:
(1) Requiring defendants to destroy all copies of all
video rental records obtained in or for this litigation
and provide a certification under oath that they have
done so.
(2) Requiring defendants and their counsel to certify
to the court under oath that they have instructed any
person to whom they have disclosed these records
(except plaintiff and his representatives) that

obtaining them was contrary to the law and that there
may be no further disclosure.
(3) Prohibiting defendants from attempting to use any
video rental records obtained in this case as evidence
in any proceeding, or offering into evidence any video
rental records obtained in this case.
(4) Requiring defendants to pay his fees for all work
necessarily done in reviewing the subpoenaed records,
developing follow up information, and preparing this
motion and memorandum.

Pl's Motion [#156] dated June 29, 2009. The Video Privacy

Protection Act (VPPA) restricts video tape service providers from

disclosing personally identifiable information concerning

consumers except in six inapplicable circumstances. 18 U.S.C. §

2710(b). The act also bars admission into evidence of personally

identifiable information obtained in any manner other than as

provided in the VPPA. 18 U.S.C. § 2710(d). Notwithstanding, a

video tape service provider may disclose personally identifiable

information concerning consumers in a civil proceeding pursuant

to a court order upon a showing of compelling need for the

information that cannot be accommodated by other means if the

person seeking the disclosure provides the consumer with

reasonable notice and an opportunity to contest the claim of the

person seeking disclosure. 18 U.S.C. § 2710(b)(2)(F).

"[T]he term 'consumer' means any renter, purchaser, or

subscriber of goods or services from a video tape service

provider[.]" 18 U.S.C. § 2710(a)(1).

"[P]ersonally identifiable information" includes
information which identifies a person as having
requested or obtained specific video materials or

services from a video tape service provider[.]

18 U.S.C. § 2710(a)(3).

"[V]ideo tape service provider" means any person,
engaged in the business, in or affecting interstate or
foreign commerce, of rental, sale, or delivery of
prerecorded video cassette tapes or similar audio
visual materials, or any person or other entity to whom
a disclosure is made [in certain circumstances], but
only with respect to the information contained in the
disclosure.

18 U.S.C. § 2710(a)(4).

Plaintiff's motion is directed at documents provided by the
Doubletree Hotel of Portland (Doubletree 65-38) consisting of a
list of movies available to purchase for viewing in hotel rooms.
The list includes the titles, ratings and prices of the available
movies.  Defendants' also possess hotel folio records and credit
card records indicating that plaintiff stayed at hotels and
charged movies on a CEC credit card 13 times.  In their response,
defendants disclose that they have issued a trial subpoena for
records from LodgeNet, the movie vendor, for records that will
demonstrate that specific movie titles were purchased in certain
Doubletree hotel rooms on certain dates.  If admitted, the jury
will know from the Lodgenet evidence and the hotel evidence the
specific movie titles purchased by plaintiff.

Plaintiff argues that the subpoena and defense counsel's
follow up request resulted in the Doubletree Hotel "being faced
with an apparent obligation to provide video rental records which
by law it was prohibited from producing."

23 - ORDER

Defendants argue that CEC is a consumer within the meaning of the VPAA, so it can consent to the disclosure of personally identifiable information related to purchases made with its credit car, Doubletree 65-68 contains no personally identifiable information, CEC cannot violate the VPPA because it is not a videotape service provider, plaintiff has no expectation of privacy in movie titles because he knew that CEC had a policy of not reimbursing personal entertainment expenses, and defendants have a compelling need to disclose the movie titles rented by plaintiff to rebut plaintiff's claims for defamation and emotional distress. Defendants argue that evidence that plaintiff purchases adult movie titles will rebut plaintiff's testimony that he did not view two pornographic videos found in his office and that he was embarrassed at receiving revealing photos of CEC's former HR employee Tammy Wanker, which were also found in his office. Defendants find this evidence relevant to plaintiff's claim that defendants defamed him by stating that he had a long term sexual relationship with Wanker. Defendants contend that a jury is entitled to find that "Tammy Gonzalez," who appears on the Embassy Suites records," is actually Wanker, and that an adult title viewed during her stay would indicate a sexual relationship between plaintiff and Wanker. Defendants also theorize that evidence that plaintiff viewed adult movie titles undercuts plaintiff's claim to be damaged by allegations

that he had an affair, because plaintiff will be shown to be personally immune to risk of public disclosure of work-related sexual activities.

Defendants are not consumers within the meaning of the VPAA by virtue of plaintiff having used the CEC credit card.

Defendants do not have a compelling need for evidence that plaintiff purchased adult movie titles. If plaintiff and Wanker stayed together at the Embassy Suites, evidence that an adult movie was charged to the room would add little probative value to that provided by the other evidence of a romantic or sexual relationship between the two, including the evidence that the two stayed together at the hotel, and the evidence that pornographic videos, an airbed, a romantic card from Wanker to plaintiff, and revealing photographs of Wanker were found in plaintiff's office. Furthermore, Doubletree 65-68 has no relevance to a stay at the Embassy Suites, and the subpoena issued to LodgNet does not request evidence related to plaintiff's December 2007 stay at the Embassy Suites. Evidence that plaintiff purchased adult movie titles does not rebut plaintiff's claim for damages from allegations that he carried on an affair with a co-worker. Plaintiff would not necessarily expect the hotel to disclose the movie titles. Evidence that plaintiff purchased adult movie titles tends to rebut his testimony that he didn't watch pornographic movie titles found in his office, but whether he did

so or not is of little consequence.

Because defendants lack compelling need for this evidence, it is inadmissible if it was obtained in violation of the VPAA. The Doubletree folio records indicate that plaintiff made movie purchases of $24.95 on August 1, 2006, and $14.99 on November 9, 2006. Doubletree 65-68 lists movie titles, ratings and purchase price. No movies are priced at $24.95. Fifteen movies are priced at $14.99, of which 9 are rated "mature." A fact-finder could ascertain from the Doubletree 65-68 and the folio evidence that plaintiff purchased one of the fifteen titles at the $14.99 price on November 9, 2006. Given the effect of the evidence, the question is, does the evidence from Doubletree "identif[y] a person as having requested or obtained specific video materials."

The statute does not define "specific video materials or services." Both sides cite to legislative history indicating that the definition of "personally identifiable information" is intended to refer to information that "identifies a particular person as having engaged in a specific transaction with a videotape provider." S.Rep. 100-599 (reprinted at 1988 U.S.C.C.A.N. 4342-1). The court finds that the combined Doubletree evidence indicating that plaintiff purchased one of fifteen movies does not constitute personally identifiable information. Doubletree did not violate the VPAA. Therefore, Section 2710(d) does not prohibit admission of Doubletree 65-68.

Defendants represent that the LodgNet records contain no names, so that production and admission of the records will not violate the VPAA.  The LodgeNet records are not before the court, even in redacted form.  The court does not determine their admissibility at this time.

Based on the foregoing, plaintiffs' motion for protective order and in limine is denied without prejudice to plaintiff to object to, and move in limine against, admission of this evidence at trial, based on the Federal Rules of Evidence or other authority.

<u>Defendants' Motion to Strike Portions of the Declarations of Al and Sue Gonzalez and Joel Aylor [#160]</u>

On the ground of hearsay, defendants move to strike portions of these declarations wherein each witness states what deceased former CEC general manager Lane Powell[1] said to the witness.  The statements are not hearsay because Lane Powell was general manager of CEC.  Further, as plaintiff and counterclaim defendant contend, the statements are offered not for their truth, but to prove that defendants' fraud counterclaim is untimely because defendant had notice of Sue Gonzalez's accounting work for NUS.  Defendants' motion to strike is denied and their hearsay objection to this evidence is overruled.

<u>Defendants' Motion in Limine Re: ERISA Claims [#222]</u>

---

[1]Former CEC general manager Lane Powell, an individual, is not to be confused with CEC trial counsel Lane Powell PC.

27 - ORDER

Defendants argue that because the ERISA plans at issue confer discretion upon the plan administrator to determine eligibility for benefits, the court should disregard evidence other than the administrative record compiled by defendants and attached to the declaration of Tom Strand. De novo review may apply if the administrator failed to render a timely benefits decision. Abatie v. Alta Health & Life Ins., Co., 458 F.3d 955, 972 (9th Cir. 2006). On de novo review, review is not necessarily limited to the administrative record. Id. at 970. Regardless of the standard of review, the court may need to consider extra-record evidence if procedural irregularities affected the administrative review or prevented full development of the record. Id. at 972-73. In permitting plaintiff to file a second amended complaint against the ERISA plan administrators and plans, the court held that the administrator delayed determining plaintiff's requests for benefits, and in the alternative, that defendants failed to fulfill plaintiff's requests for plan documents in violation of ERISA's procedural requirements. Order dated April 15, 2009 at 2. On account of this procedural irregularity and the need to examine the language of each plan, defendants' motion for a blanket ruling limiting the scope of review to what defendants deem the administrative record is denied.

Motions for Summary Judgment & Partial Summary Judgment

Counterclaim defendant filed a motion for summary judgment [#116] on defendants' counterclaims. Defendants filed a motion for partial summary judgment [#125]. (Defendants seek judgment on plaintiff's first claim for ERISA benefits and penalties and clarification and enforcement of plans, and on plaintiff and counterclaim defendant's "counterclaims" alleged in their replies.[2]) Plaintiff filed a motion for partial summary judgment [#133] on his first, and on defendants' counterclaims. Defendant Loy Peterson filed a motion for summary judgment [#141] on plaintiff's first claim.

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

I. <u>Undisputed Facts</u>

As an employee of CEC, plaintiff participated in the Retiree Medical Plan (medical plan), the Management Incentive Plan for Management Employees (MINT plan), the Pension Restoration Plan (PRP), and the Deferred Compensation Plan (DCP).

The parties dispute whether plaintiff resigned his employment with CEC, or whether CEC terminated his employment. A May 2, 2008 letter from CEC president Dave Markham states that the board authorized Markham to immediately terminate plaintiff's

---

[2]As noted, plaintiff and counterclaim defendant's "counterclaims" are procedurally improper.

29 - ORDER

employment based on unauthorized transactions and violations of company policies and procedures.  The letter further states that CEC rejected plaintiff's attempt to resign.

A June 8, 2009 letter signed by David Markham states that plaintiff's claim for Retiree Medical Coinsurance Plan (RMCP) benefits is denied because plaintiff was terminated for cause and therefore is not an eligible "retiree" within the meaning of the RMCP.  The letter further states that plaintiff is ineligible because additional information came to light following termination that plaintiff committed acts of dishonesty and other acts not known to at the time of termination for cause.  Strand Decl., ex. F at 81.

A February 27, 2009 letter signed by David Markham states that the CEC board of directors, acting as the MINT plan administrator, denied plaintiff's claim for MINT plan benefits under paragraph 6(a) of the MINT plan, which provides, "No benefits shall apply to a terminated Participant who is discharged from his employment with the Company on account of dishonesty or misconduct."

Plaintiff wrote a letter dated April 7, 2009 addressed to the benefits administrator of CEC.  The letter states in part, "This is to advise you that I am appealing the Notice of Benefit Denial of the [MINT plan]."  Plaintiff submitted supplemental materials received by CEC on May 4, 2009.

30 - ORDER

David Markham signed a "Notice of Decision on Review" dated June 8, 2009.  The document states that on review, plaintiff's request for MINT plan benefits is denied, and that the administrator relied on paragraph 6(a) of the MINT plan.

David Markham signed a letter "Notice of Partial Benefit Denial" dated February 27, 2009.  The letter states that the company, through its board, acting as the administrator, determined that plaintiff was entitled to a lump sum "Severance pay benefit of $16,472.63 under the Severance Pay PRP and a 'Deferred Compensation PRP Benefit' of $0 under the Deferred Compensation PRP [(Deferred Comp PRP)]."

By letter dated April 7, 2009, plaintiff appealed CEC's decision.  Plaintiff submitted additional information in support of his appeal on April 29, 2009.  Plaintiff claimed that CEC's calculation was inaccurate because (a) it excluded compensation he received from CEC Resources, a subsidiary of CEC; and (b) it was based on an annual salary of $165,000 (his salary after he stepped down as president of CEC in October 2006) rather than an annual salary $229,000 (his annual salary prior to stepping down as president of CEC).

David Markham signed a letter "Notice of Decision on Review" dated June 8, 2009.  The letter states that the administrator's previous decision was correct, plaintiff' request for plan benefits must be denied, and plaintiff's annual rate of pay as of

31 - ORDER

November 15, 2006 was $165,000, because plaintiff stepped down as CEC's president effective October 8, 2006.

On February 27, 2009, CEC notified plaintiff that he was eligible for benefits under the DCP.  CEC paid plaintiff $31,000 (with $189.57 in interest).  Plaintiff appealed, claiming that CEC owed him interest at the rate of 9 percent commencing April 30, 2008.

Plaintiff and CEC entered into an employment agreement on November 1, 2002.  Plaintiff claims to have resigned on April 2, 2008, effective May 2, 2008.  CEC claims to have rejected plaintiff's resignation and terminated plaintiff's employment effective May 2, 2008.  Counterclaim defendant Sue Gonzalez resigned her employment from CEC on June 1, 1990.

Plaintiff testified that he received by mail a photo album with revealing photographs of CEC's human resources manager Tammy Wanker.  Exhibit 504 to plaintiff's deposition taken on behalf of defendants contains within it a copy of the inside cover of the photo album with the inscription partially covered. Defense counsel did not question plaintiff about the inside cover of the photo album with the partially covered inscription.  The complete inscription states, "Bob, Merry Christmas!  Love, Tammy 2000."

Defense counsel sent plaintiff's counsel a letter dated February 13, 2009.  The letter states that its purpose is "to

respond to the unfounded allegation made by you during the second day of the deposition of [plaintiff] that I, or Lane Powell [PC], deliberately altered and/or modified evidence in an effort to embarrass or humiliate [plaintiff] . . ."  The letter provides a detailed explanation as to how the inscription on the photo album received by plaintiff came to be partially covered.  Counsel for plaintiff responded in a letter to defense counsel dated February 29, 2009, "We do not believe the explanations regarding the altered exhibit contained in your letter . . .  We intend to raise this and other similar issues with the jury."

On May 1, 1987, plaintiff completed a notarized form of "Notification of Choice of Medical Insurance Premium Payment Upon Retirement From Central Electric Cooperative."  Plaintiff elected the "new" policy (adopted March 19, 1987) "which provides for the payment of between 0% and 100% of . . . medical insurance premiums upon retirement . . . based solely upon the percentage of . . . unused sick leave . . . at the time of . . . retirement."

Effective April 1, 2004, the CEC board revised the Wage and Benefit Policy, including the retiree medical plan.  Hunt Decl. ex. D at 172-74.

At a special meeting on January 23, 2009, the CEC board passed a resolution purportedly revising the retiree medical policy.  Plaintiff contends that the purpose of the revision was

33 - ORDER

to render him retroactively ineligible for medical coverage under
the plan.  Defendants contend that the board adopted the revision
to conform the policy to longstanding CEC practice at the
recommendation of Lane Powell PC attorney Dauenhauer.  The
revision provides, among other things, that since the inception
of the plan, the terms "retirement" and "retire" have been
interpreted to mean that the employee leaves CEC employment
without cause and eligible for retirement benefits under the
plan.  Strand Decl., ex. E at 6.  CEC stated to its employees
that nothing in the revision to the retiree medical plan is
intended to modify the retiree medical plan document or any of
its terms.  Id. at 7.  In the event of a conflict between the
revision and the retiree medical plan document, the document
controls.  Id.

     CEC formed subsidiaries in 2001, including CEC Resources,
Inc.  Beginning on October 1, 2001, plaintiff drew a $35,000
annual salary to be paid on the first of each month, including
retroactive pay, from January 1, 2001.  The parties dispute
whether CEC or CEC Resources paid this salary.

     On May 16, 2002, the CEC board unanimously approved a motion
to exclude subsidiaries from CEC's retirement plans.

     CEC adopted the Pension Restoration Plan (PRP) in 2003 and
amended the plan on December 16, 2004.  The amendment specifies,
inter alia, that the date set for plaintiff under Section 3 of

34 - ORDER

the plan for forfeiture of benefits should employment terminate before that date for reasons other than death or disability is December 16, 2004.  The parties dispute whether the $35,000 plaintiff received for overseeing CEC Resources is properly included in plaintiff's CEC salary for purposes of determining PRP plan benefits.

The fiduciary of the PRP, National Rural Electric Cooperative Association (NRECA), calculated that Gonzalez was entitled to approximately $352,672.61 from the PRP upon his separation from CEC on May 2, 2008.

Under the Retirement and Security Plan (R&S), calculations for the pension benefit depend upon the beneficiary's salary during certain years of employment, and for each year the calculations are based on salary as of November 15 of that year.

On June 27, 2008, CEC president Markham advised NRECA that plaintiff's salary was $165,000, not $264,000, as plaintiff had reported.

Hansen attended all CEC Board meetings and was present throughout each meeting.

Sue Gonzalez was employed at CEC in the accounting department as an assistant bookkeeper and cost accountant into 1990.  During her employment with CEC, she was never made aware of any policy or rule forbidding her from having a second job.

Buck and Deanna Wooten and Sue Gonzalez are childhood

friends.  Sue Gonzalez contends that the Wootens set up NUS in 1988.  Defendants contend that plaintiff registered the NUS name in 1986 and that plaintiff, Sue Gonzalez and the Wootens set up NUS in 1988.  Sue Gonzalez was not married to plaintiff in 1988, and was then known as Sue Smith.  Plaintiff and Sue Gonzalez had a personal relationship at that time.

Plaintiff and Sue Gonzalez married in March 1990.  Sue Gonzalez resigned from CEC shortly thereafter.

Sue Gonzalez performed management and administrative tasks for NUS.

II.  <u>First Claim</u>

Defendant former CEC director Loy Peterson contends that he is entitled to judgment as a matter of law because he lost his board position on October 16, 2008, and plaintiff requested ERISA plan benefits for the first time on October 24, 2008.  The court has held that CEC viewed plaintiff' April 30, 2008 resignation letter as a request for ERISA plan benefits or, in the alternative, that the CEC board deprived plaintiff of meaningful access to administrative procedures.  The latter holding may trigger liability for statutory damages for violation of ERSIA's procedural requirements, as alleged in count V of plaintiff's first claim for relief.  Peterson is not entitled to summary judgment on plaintiff's first claim and his motion for summary judgment is denied.

36 - ORDER

A.  Count I - ERISA Benefits

    1.  Retiree Medical Plan

        a.  Standard of Review

The parties dispute the standard of review that applies to a denial of benefits under the retiree medical plan.

The summary plan description (SPD) of the NRECA Medical PPO Plan, of which defendants contend the Retiree Medical Plan is a part, provides that the administrator has "discretionary and final authority to interpret and implement the terms of the Plan, resolve ambiguities and inconsistencies, and make all decision s regarding eligibility and/or entitlement to coverage or benefits[,]" and that the administrator is the NRECA senior vice president of insurance and financial services.  Strand Decl., ex. B. at 69.  The SPD further provides that "Benefits Administrator, Central Electric Cooperative, Inc.," is "the person who has Plan Administrator responsibilities for your employer."  Id. at 70.

Plaintiff points to numerous alleged procedural irregularities on the part of defendants with respect to his claim for benefits under this plan.  Plaintiff contends that the administrator's decision is not entitled to deferential review because the administrator did not respond to his initial April 30, 2008 request for benefits upon separation, CEC withheld plan documents by sequestering the contents of plaintiff's office and thereafter failed to respond to plaintiff's attorney's requests

37 - ORDER

for documents on plaintiff's behalf, Markham served as both the initial and final decision maker, in violation of ERISA, the initial decision refers to an enclosed calculation of benefits, but the calculation is not enclosed (thereby depriving plaintiff of the opportunity to challenge the calculation), and CEC is the funding source as well as the administrator of this plan.

Plaintiff requested benefits under this plan in his resignation letter dated April 30, 2008. Plaintiff points to documentary evidence prepared by Markham in January and April 2008 indicating Markham's concern that Wanker was loyal to plaintiff, rather than to him. Hunt Decl., ex. D at 307-310. Markham states that Wanker cannot be trusted because of her relationship with plaintiff. Id. at 310. Further, the SPD provisions relied upon by both parties are at best ambiguous as to whether CEC has discretion to interpret the plan and make benefits decisions. Based on the foregoing, the default de novo standard of review applies to the decision to deny benefits under this plan.

b.  Merits

Viewing the evidence in the light most favorable to plaintiff on de novo review, plaintiff retired from CEC, Strand Decl., ex. N at 129, plaintiff applied for benefits at the end of April 2008, defendants failed to respond and withheld his plan documents and denied his requests for plan documents until

October 2008 when plaintiff learned of the procedure to apply for benefits following commencement of litigation. Further, (viewing the evidence in the light most favorable to plaintiff), defendants rewrote the plan and utilized an emergency board meeting for the specific purpose of denying plaintiff's claim for benefits and falsely stated that they did so to conform to long-standing practice, the new definition of retiree adds a requirement not found in the 2004 provisions (specifically, that a person terminated for cause is ineligible), plaintiff's medical plan benefits vested in 1987[3] when he elected to exchange accrued sick leave for medical benefits for life, the 2009 revision to the retiree medical plan did not alter the terms of the 2004 revision which promised medical insurance premium benefits for life with no exception for retirees terminated for cause, the 2009 revision conflicts with the 2004 revision so that the 2004 revision controls, plaintiff meets the plan definition of a retiree, and defendants did not issue a final decision denying retiree medical plan benefits until the eve of the summary judgment deadline. In these circumstances, defendants' are not entitled to summary judgment. At a minimum, the parties dispute which terms comprise the retiree medical plan. For this reason

---

[3]ERISA does not prohibit modification or termination of employee welfare benefits plans; nor does it require that welfare plan benefits vest. See Grozs-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1160 (9th Cir. 2001). Welfare benefit plans may prohibit modification or provide that benefits vest, however.

and the reasons cited by defendants and the administrator,
plaintiff also is not entitled to summary judgment on this claim.

      2.  Severance Pay PRP

        a.  Standard of Review

The plan provides,

10.  General Administrative Powers and Duties.  General
administration of the Severance Pay PRP shall be placed
in the Board of Directors of the Cooperative (the
"Board").  The Board shall have the power to take all
actions required to carry out the provisions of the
Severance Pay PRP and shall further have the following
powers and duties which shall be exercised in a manner
consistent with the provisions of the Severance Pay
PRP:
(a) To construe and interpret the provisions of the
Severance Pay PRP and make rules and regulations under
the Severance Pay PRP to the extent deemed advisable by
the Board, (b) To decide all questions as to
eligibility to become a participant in the Severance
Pay PRP and as to the rights of participants under the
Severance Pay PRP.
* * * *
11.  Grant of Discretion.  In discharging the duties
assigned to it under the Severance Pay PRP, the Board
and its delegates have the discretion and final
authority to interpret and construe the terms of the
Severance Pay PRP; to determine coverage and
eligibility for and amount of benefits under the
Severance Pay PRP; to adopt, amend, and rescind rules,
regulations and procedures pertaining to its duties
under the Severance Pay PRP and the administration of
the Severance Pay PRP; and to make all other
determinations deemed necessary or advisable for the
discharge of its duties or the administration of the
Severance Pay PRP.  The discretionary authority of the
Board and its delegates is final, absolute, conclusive
and exclusive, and binds all parties so long as
exercised in good faith.  Any judicial review of any
decision of the Board or its delegates shall be limited
to the arbitrary and capricious standard of review.

Strand Decl., ex. I at 24.

40 - ORDER

The quoted language will trigger abuse of discretion review if such review is otherwise appropriate. However, the same procedural irregularities surround plaintiff's application for severance PRP benefits as his application for retiree medical benefits. Furthermore, CEC is the funding source as well as the administrator of this plan. Once again, de novo review is warranted. Plaintiff requested R&S and PRP benefits upon separation, as well as benefits under other plans and return of personal items. Hunt Decl., ex. D at 179. Defendants did not timely provide the personal items, including plaintiff's copies of plans. Defendants did not respond to the requests of plaintiff and his attorney for plan documents, which would have apprised plaintiff of proper claim procedures under the plans. Plaintiff had to sue to get action. Markham's initial decision was untimely even if calculated from plaintiff's October 24, 2008 request for benefits, which plaintiff characterized as an appeal. In Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection, 349 F.3d 1098 (9th Cir. 2003), the court held that the administrator did not exercise discretion when he failed to make a benefits decision within the 60 day period provided by the plan. The Severance PRP provides for a 90-day period, so a decision would have been due around August 1, 2008. Strand Decl., ex. I at 5. As in Jebian, the procedural violations were not inconsequential. While CEC honored the April 28, 2008

request for deferred compensation in part, it failed to render a decision on the severance PRP.

       b.  Merits

    The parties seem to agree that this plan provides supplemental retirement benefits for high earners whose benefits under the R&S are capped by IRC income limitations.  The amount of the benefit is determined by the difference of what the R&S benefit would be in the absence of an income cap, and the actual R&S benefit under the cap.  Thus, the amount of the Severance PRP benefit corresponds to the amount by which the earner's income exceeds the income cap.  The benefit for a given year is determined based on the earner's salary as of November 15 of that year.  Plaintiff retired from his duties as CEC president in 2006, although he maintained employment with CEC.  Defendants contend that plaintiff earned $165,000 in 2006, and plaintiff contends that he earned $264,000.  Under defendants' contention, plaintiff would be entitled to a benefit of approximately $16,000.  Under plaintiff's contention, plaintiff would be entitled to a benefit of approximately $350,000.  The administrative record contains documents supporting defendants' contention that plaintiff stepped down effective October 8, 2006, so that his 2006 salary for determining the Severance PRP benefit was $165,000.  Plaintiff produced extra-record documents indicating that the board agreed that plaintiff would be paid his

annual salary of $264,000 until November 20, 2006, in order to realize the Severance PRP benefit for 2006.  Plaintiff states that his 2006 W-2 reflects that he made $264,000 as an employee of CEC.  The court does not find a copy of the w-2 in the record, however.  Plaintiff further states that Markham contacted NRECA in 2008 and advised NRECA to calculate the benefit based on the lower figure, 2 years after the fact.

As far as the court can determine, the $264,000 figure for which plaintiff advocates includes $35,000 plaintiff received for managing CEC resources.  Whereas defendants point to a June 2002 amendment to the R&S plan stating that subsidiary employees are not eligible for that plan, plaintiff points out that the CEC board adopted the severance PRP much later, and plaintiff was not a subsidiary employee.

On de novo review, the court considers plaintiff's evidence, in the form of the declarations of plaintiff, Tammy Wanker and Loy Peterson, that the board agreed that plaintiff would be paid $264,000 through November 20, 2006 in order to maintain the severance PRP benefit for that year, and that plaintiff is an employee of CEC, rather than of a subsidiary.  Therefore, disputed issues of fact preclude summary judgment with respect to the severance PRP.

            3.  MINT Plan

                a.  Standard of Review

43 - ORDER

The parties dispute certain terms of this plan, but they agree that the plan provides that the administrator is the Company or its designate, and

> The Administrator shall have the authority to administer the Plan and to construe its provisions, and the decision of the Administrator shall be final and binding on all parties. The Administrator shall constitute the "administrator" and "named fiduciary" of the Plan with the meaning of [ERISA].

Strand. Decl., ex. H at 39. The same procedural irregularities noted above apply with respect to plaintiff's clam for benefits under this plan. The court applies the de novo standard of review for the reasons stated above.

        b. Merits

The parties dispute whether the MINT plan contains a forfeiture clause whereby the participant forfeits benefits if he is terminated due to dishonesty or misconduct. The record contains no signed copy of the MINT plan. The record contains an NRECA template with a forfeiture clause, and an election signed by former CEC general manager Lane Powell indicating that the clause should not be included. Hunt Decl. ex. D at 189. Minutes of the August 17, 1989 CEC board meeting indicate board approval of a resolution to adopt a MINT plan that will follow the prototype plan design as recommended by NRECA. Strand Decl., ex. H. at 91. The minutes refer to an attached resolution which does not appear in the record. Based on the state of the record on de novo review, whether the MINT plan contains a forfeiture

44 - ORDER

provision for termination for dishonesty or misconduct is a disputed issue of fact. Neither plaintiff nor defendants are entitled to summary judgment with respect to the MINT plan.

B. Counts II, III and IV

Based on the foregoing, no party is now entitled to judgment as a matter of law clarifying or enforcing terms of the MINT and Retiree Medical plans, as alleged in counts II-IV of plaintiff's first claim for relief.

E. Count V - Penalties for Failure to Provide Plan Docs.

Plaintiff seeks statutory penalties of $110 per day for every day that defendants failed to provide plan documents beyond 30 days following his July 29, 2008 request for documents. He contends that the April 15, 2009 alternative holding of the court that amendment to allege ERISA claims would not be futile due to defendants' denial of meaningful access to ERISA procedures is the law of the case. The law of the case doctrine does not apply to a district court's interlocutory orders. Furthermore, the sanction is within the discretion of the court. 29 U.S.C. § 1132(c)(1). Defendants produced evidence that they relied on statements of plaintiff's attorney to determine the timing for production of plan documents after the matter went to litigation in late July 2008. Hosenpud Decl., ex. 5. Based on this evidence and the discretion conferred by the statute, plaintiff is not entitled to summary judgment on count V of his first

45 - ORDER

claim.

    F.  CEC's Affirmative Defense of Offset

    Plaintiff cites to 29 U.S.C. § 1056(d), 26 C.F.R. § 1.401(a)-13(b),(c) and <u>Guidry v. Sheet Metal Workers Nat'l Pension Fund</u>, 493 U.S. 365, 367-68 (1990) for the proposition that as a matter of law, defendants are not entitled to a setoff against his ERISA plan benefits.  Congress barred alienation and assignment of ERISA pension plan benefits, but not ERISA employee welfare plan benefits.  <u>Mackey v. Lanier Collection Agency & Service, Inc.</u>, 486 U.S. 825, 838 (1988).  As plaintiff seeks employee welfare plan benefits, summary judgment in favor of plaintiff on defendants' fifth affirmative defense is denied.

III.  <u>Third Claim - Breach of Contract</u>

    For this claim, plaintiff alleges that on November 26, 2006, he entered into an agreement to oversee CEC subsidiaries LS Networks, Quantum Communications and CoEnergy.  Plaintiff alleges that CEC refused to pay incentive compensation it promised to pay for this work.  There appears no dispute that CEC agreed to pay incentive pay.  Plaintiff contends that liability is established as a matter of law, and only the issue of damages remains for trial.  Defendants claim that plaintiff breached fiduciary duties by convincing LS Networks's board to retroactively modify the depreciation schedule to convert an $800,000 loss into a gain, without disclosing that he stood to gain financially from the

46 - ORDER

change.  If true, plaintiff may be entitled to nothing.  <u>Horton</u>
<u>v. Whitehall</u>, 854 P.2d 977 (Or. App. 1993).  Summary judgment on
defendants' liability on plaintiff's third claim is inappropriate
due to disputed issues of material fact.

IV.  <u>Fourth Claim - Unpaid Compensation</u>

For his fourth claim, plaintiff alleges that defendants
failed to pay him all amounts due at the time of termination, in
violation of section 652.140 of the Oregon Revised statutes.  In
his memorandum, plaintiff argues that the failure stems form
defendants' improper withholding of $31,000 of deferred
compensation and incentive compensation earned in 2007 and 2008.
The parties dispute the amount of compensation owed to plaintiff,
and whether the deferred compensation plan is an ERISA plan, so
that all or part of this wage claim is preempted by ERISA.  <u>See</u>
<u>Baumberger v. Hollywood Entertainment Corp.</u>, 2006 WL 3513648, * 5
(D. Or. 2006).  Summary judgment on this claim is inappropriate.

V.  <u>Defendants' Counterclaims</u>

A.  Fraud

For their fraud counterclaim, defendants allege that
plaintiff and counterclaim defendant intentionally concealed and
actively misrepresented their financial interest in the
relationship between NUS and Summit Accounting with the intent
that CEC rely on the misrepresentations, and that CEC relied on
the misrepresentations, enabling plaintiff and counterclaim

47 - ORDER

defendant to receive approximately $1.8 million, nearly 40% of amounts paid by CEC to NUS between 1997 and 2008.

Plaintiff and counterclaim defendant argue that the claim is untimely, the claim fails on the merits because there was no misrepresentation, and CEC was not damaged by anything plaintiff or counterclaim defendant did.

The claim fails to meet the heightened pleading requirements applicable to fraud claims as provided in Rule 9(b) of the Federal Rule of Civil Procedure. Defendants only generally allege that plaintiff, from 2003 or earlier, expressly denied to CEC and individual board members that plaintiff received financial benefit from the NUS/CEC contractual relationship. Defendants do not identify specific dates, individual recipients of statements, and whether plaintiff's statements were written or oral. Defendants fail to state a claim for fraud.

B. Breach of Fiduciary Duty

In this claim, defendants allege that plaintiff breached fiduciary duties owed to CEC by, since 2003 or earlier, concealing and/or misrepresenting to the board or individual directors, his financial interest in the contracts between NUS and CEC which he helped negotiate. Plaintiff argues that these allegations fail to state a claim. Plaintiff's authority, In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1091 (9th Cir. 2002), and In re Silicon Graphics, Inc. Securities

48 - ORDER

Litigation, 183 F.3d 970, 985 (9th Cir. 1999), speak to the heightened pleading requirements applicable to fraud claims. The standard does not apply to claims for breach of fiduciary duty. Concha v. London, 62 F.3f 1493, 1503 (9th Cir. 1995).

Plaintiff argues that the claim is untimely. Plaintiff points to evidence that CEC received notice of alleged breach of fiduciary duties concerning NUS outside of the limitations period. Defendants point to evidence that defendants relied upon plaintiff's denials of the allegations during investigations in 2003 and 2006. Whether defendants reasonably relied on the denials, exercised reasonably diligence and had sufficient notice of the alleged breaches to trigger commencement of the limitations period are matters for the jury. See Mathies v. Hoeck, 588 P.2d 1, 3 (Or. 1978).

Plaintiff argues that this claim fails on the merits because he fully disclosed his wife's business relationship with NUS. As noted above, defendants produced evidence that plaintiff denied that a relative received any remuneration from NUS.

Plaintiff argues that defendants' demand that plaintiff disgorge all the money he earned during his employment with CEC while his wife worked for the meter reading company has no basis in law. The court need not determine entitlement to damages at this time.

C. Breach of Contract

49 - ORDER

Defendants allege that plaintiff breached the employment contract he entered into with CEC on November 1, 2002, which required that he comply with the policies, rules and regulations as determined by the board.  Defendants argue that the conflict of interest provision of the employee handbook is such a policy, rule or regulation, as is the conflict of interest policy adopted by the board in May 2006.  The handbook provides,

> Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest.
> * * *
> An actual or potential conflict of interest occurs when you are in a position to influence a decision that may result in a personal gain for you or a relative as a result of CEC's business dealings.
> * * *
> [I]f you have any influence on transactions involving purchases, contracts or leases, it is imperative that you disclose the existence of such relationship to your Department Head immediately.

Hosenpud Decl., ex. 60 at 13.  The handbook states that the policies it contains "are not intended to create a contract, nor do they constitute contractual obligations[.]"  Rather, "[i]t is a guide[.]"  Id. at 8.  Although the handbook refers to its provisions as policies, it does not refer to its provisions as policies of the board, to which plaintiff is contractually obligated to adhere.  Defendants point to no such evidence.  The board's May 2006 resolution provides, "No employee or director is to . . . accept any compensation . . . from any current . . . contractor."  Keeton Decl., ex. 8 at 5.

50 - ORDER

A reasonable juror could not conclude that the handbook's conflict of interest provision is a rule, regulation or policy of the board to which plaintiff is contractually bound, or that plaintiff accepted compensation form a contractor of CEC.

Plaintiff is entitled to summary judgment on defendants' breach of contract counterclaim.

D.   Accounting

For their fourth counterclaim, defendants claim entitlement to a full accounting from plaintiff and Sue Gonzalez for all monies received by them arising out of their financial relationship with NUS.  Plaintiff argues that defendants are not entitled to an accounting, because they pray for damages and thus have an adequate remedy at law.  See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962).  Plaintiff further argues that an accounting is barred because defendants have no legal interest in the subject matter.  By citing to Patterson v. Getz, 111 P.2d 842 (Or. 1940), defendants may imply that "the account is so complicated that it cannot be settled at law without great difficulty, a bill in equity may be maintained."

An accounting is unnecessary.  Defendants' experts opine that Summit Accounting provided excessive services to NUS at excessive rates.  These experts state that they know the scope and costs of bookkeeping services required by companies like NUS. Defendants also commissioned multiple audits and claim to have

evidence that Summit Accounting received $1.8 million from NUS from 1997-2008, a figure that represents nearly 40% of amounts received by NUS from CEC.  Defendants do not demonstrate that the evidence is insufficient to calculate damages.

Plaintiff is entitled to judgment on defendants' counterclaim for an accounting.

VI.    <u>Plaintiff's Affirmative Defenses to Defs' Counterclaims</u>

Defendants move for partial summary judgment or to strike certain affirmative defenses of plaintiff to defendants' counterclaims.  The motion is granted to the extent that plaintiff may not rely on his tenth, eleventh, and thirty-fourth affirmative defenses at trial.  Defendants' purpose in asserting counterclaims is not a defense to the surviving counterclaim of breach of fiduciary duty, as alleged in plaintiff's tenth affirmative defense.  Defendants' counterclaims do not interfere with plaintiff's ability to pursue rights protected by ERISA, as alleged in plaintiff's eleventh affirmative defense.  The thirty-fourth affirmative defense to defendant's claim for an accounting is moot because the court herein determines that defendant is not entitled to an accounting.  The court will determine closer to trial whether plaintiff may rely on his seventeenth, twenty-third and twenty-fourth affirmative defenses, which are based on alleged conduct of defendants' current and former counsel.  In the absence of additional evidence than that produced by

plaintiff at the summary judgment stage, the court will bar
plaintiff from relying on the seventeenth, twenty-third and
twenty-fourth affirmative defenses.

VII.    Plaintiff and Counterclaim Defendant's Prayer for Attorney
        Fees Pursuant to 28 U.S.C. § 1927

    Plaintiff's answer (denominated as a "reply") to defendants'
counterclaims contains a prayer for attorney fees pursuant to 28
U.S.C. § 1927.  That statute provides that counsel who "so
multiplies the proceedings in any case unreasonably and
vexatiously may be required by the court to satisfy the excess
costs, expenses and attorneys' fees reasonably incurred because
of such conduct."  28 U.S.C. § 1927.  Defendants contend that the
court should strike plaintiff's prayer for this relief.  The
court declines to strike the prayer.  The court will not award
attorney fees except upon motion of a party.  The court expresses
no opinion on the merits of the prayer.

Conclusion

    Based on the foregoing, in civil case number 08-6236-HO:
counterclaim defendant's motion for summary judgment [#116] is
granted; plaintiff's motion to dismiss counterclaims as a
sanction [#122] is denied without prejudice, as provided herein;
defendants' motion for summary judgment [#125] is denied;
plaintiff's motion for partial summary judgment [#133] is granted
in part and denied in part, as provided herein, defendant Loy
Peterson's motion for partial summary judgment [#141] is denied;

plaintiff's motion for protective order/motion in limine [#156] is denied without prejudice, as provided herein; defendants' motion to strike [#160] is denied; plaintiff's motion to strike [#164] is denied; defendants' motion to dismiss [#192] is granted; plaintiff's motion to disqualify, dismiss, enter default [#195] is denied; plaintiff's motion to strike [#200] is denied; and defendants' motion in limine [#222] is denied.  In civil case number 08-6240-HO: counterclaim defendant's motion for summary judgment [#112] is granted; plaintiff's motion to dismiss counterclaims as a sanction [#118] is denied without prejudice, as provided herein; defendants' motion for summary judgment [#121] is denied; plaintiff's motion for partial summary judgment [#129] is granted in part and denied in part, as provided herein, defendant Loy Peterson's motion for partial summary judgment [#137] is denied; plaintiff's motion for protective order/motion in limine [#152] is denied without prejudice, as provided herein; defendants' motion to strike [#156] is denied; plaintiff's motion to strike [#160] is denied; defendants' motion to dismiss [#188] is granted; plaintiff's motion to disqualify, dismiss, enter default [#191] is denied; plaintiff's motion to strike [#196] is

///


///



54 - ORDER

denied; and defendants' motion in limine [#218] is denied.

Counterclaim defendant is dismissed from these consolidated

actions.

SO ORDERED.

DATED this __15th__ day of October, 2009.


        ___s/ Michael R. Hogan_____
        United States District Judge