IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

ALBERT GONZALEZ,                                   Civ. No. 08-6236-HO
                                                   (Lead)
            Plaintiff,

                                                   Civ. NO. 08-6240-HO
      v.                                           (Consolidated)

                                                   FINDINGS OF FACT AND
                                                   CONCLUSIONS OF LAW

CENTRAL ELECTRIC COOPERATIVE,
INC., et al.,

            Defendants.


      After bifurcation, the parties tried to the court plaintiff's
claims to recover benefits under the Employee Retirement Income
Security Act (ERISA), interference with ERISA rights and
retaliation for seeking benefits.

      Plaintiff Albert Gonzalez is the former chief executive
officer and president of defendant Central Electric Cooperative,
Inc. (CEC).  As an employee of CEC, plaintiff participated in the

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Retiree Medical Plan (medical plan), the Management Incentive Plan for Management Employees (MINT plan), the Pension Restoration Plan (PRP), and the Deferred Compensation Plan (DCP).

The communications regarding plaintiff's entitlement to various benefits, noted in the court's summary judgment order, is reiterated here for purposes of factual background. A May 2, 2008 letter from CEC president David Markham states that the board authorized Markham to immediately terminate plaintiff's employment based on unauthorized transactions and violations of company policies and procedures. The letter further states that CEC rejected plaintiff's offer to resign.

A June 8, 2009 letter signed by Markham states that plaintiff's claim for Retiree Medical Coinsurance Plan (RMCP) benefits is denied because plaintiff was terminated for cause and therefore is not an eligible "retiree" within the meaning of the RMCP. The letter further states that plaintiff is ineligible because additional information came to light following termination that plaintiff committed acts of dishonesty and other acts not known at the time of termination for cause.

A February 27, 2009 letter signed by David Markham states that the CEC board of directors, acting as the MINT plan administrator, denied plaintiff's claim for MINT plan benefits under paragraph 6(a) of the MINT plan, which provides, "No benefits shall apply to a terminated Participant who is discharged from his employment with

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

the Company on account of dishonesty or misconduct."

Plaintiff wrote a letter dated April 7, 2009, addressed to the benefits administrator of CEC. The letter states in part, "This is to advise you that I am appealing the Notice of Benefit Denial of the [MINT plan]." Plaintiff submitted supplemental materials received by CEC on May 4, 2009.

David Markham signed a "Notice of Decision on Review" dated June 8, 2009. The document states that on review, plaintiff's request for MINT plan benefits is denied, and that the administrator relied on paragraph 6(a) of the MINT plan.

David Markham signed a letter "Notice of Partial Benefit Denial" dated February 27, 2009. The letter states that the company, through its board, acting as the administrator, determined that plaintiff was entitled to a lump sum "Severance pay benefit of $16,472.63 under the Severance Pay PRP and a 'Deferred Compensation PRP Benefit' of $0 under the Deferred Compensation PRP [(Deferred Comp PRP)]."

By letter dated April 7, 2009, plaintiff appealed CEC's decision. Plaintiff submitted additional information in support of his appeal on April 29, 2009. Plaintiff claimed that CEC's calculation was inaccurate because (a) it excluded compensation he received from CEC Resources, a subsidiary of CEC; and (b) it was based on an annual salary of $165,000 (his salary after he stepped down as president of CEC in October 2006) rather than an annual

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

salary of $229,000 (his annual salary prior to stepping down as president of CEC).

David Markham signed a letter "Notice of Decision on Review" dated June 8, 2009.  The letter states that the administrator's previous decision was correct, plaintiff' request for plan benefits must be denied, and plaintiff's annual rate of pay as of November 15, 2006 was $165,000, because plaintiff stepped down as CEC's president effective October 8, 2006.

On February 27, 2009, CEC notified plaintiff that he was eligible for benefits under the DCP.  CEC paid plaintiff $31,000 (with $189.57 in interest).  Plaintiff appealed, claiming that CEC owed him interest at the rate of 9 percent commencing April 30, 2008.

With respect to the plans at issue, the court noted the following which is provided as further factual findings in this case.

On May 1, 1987, plaintiff completed a notarized form of "Notification of Choice of Medical Insurance Premium Payment Upon Retirement From Central Electric Cooperative."  Plaintiff elected the "new" policy (adopted March 19, 1987) "which provides for the payment of between 0% and 100% of . . . medical insurance premiums upon retirement . . . based solely upon the percentage of . . . unused sick leave . . . at the time of . . . retirement."

Effective April 1, 2004, the CEC board revised the Wage and

Benefit Policy, including the retiree medical plan.

At a special meeting on January 23, 2009, the CEC board passed a resolution revising the retiree medical policy.  The revision provides, among other things, that since the inception of the plan, the terms "retirement" and "retire" have been interpreted to mean that the employee leaves CEC employment without cause and is eligible for retirement benefits under the plan.  CEC stated to its employees that nothing in the revision to the retiree medical plan is intended to modify the retiree medical plan document or any of its terms.  In the event of a conflict between the revision and the retiree medical plan document, the document controls.

CEC formed subsidiaries in 2001, including CEC Resources, Inc. Beginning on October 1, 2001, plaintiff drew a $35,000 annual salary from CEC Resources, Inc. to be paid on the first of each month, including retroactive pay, from January 1, 2001.

On May 16, 2002, the CEC board unanimously approved a motion to exclude subsidiaries from CEC's retirement plans.

CEC adopted the Pension Restoration Plan (PRP) in 2003 and amended the plan on December 16, 2004.  The amendment specifies, among other things, that the date set for plaintiff under Section 3 of the plan for forfeiture of benefits should employment terminate before that date for reasons other than death or disability is December 16, 2004.

The fiduciary of the PRP, National Rural Electric Cooperative

Association (NRECA), calculated that Gonzalez was entitled to approximately $352,672.61 from the PRP upon his separation from CEC on May 2, 2008.

Under the Retirement and Security Plan (R&S), calculations for the pension benefit depend upon the beneficiary's salary during certain years of employment, and for each year, the calculations are based on salary as of November 15 of that year.

On June 27, 2008, CEC president Markham advised NRECA that plaintiff's salary was $165,000, not $264,000, as plaintiff had reported.

At this stage of the proceedings, plaintiff asserts entitlement to lifetime retiree medical benefits, entitlement to a benefit of $352,672 under the PRP and entitlement to MINT benefits when he reaches the age of 62. In addition, plaintiff asserts entitlement to a penalty for defendants' alleged refusal to supply requested ERISA information. Plaintiff also seeks a declaration that defendants interfered with his ERISA rights and retaliated against him for asserting those rights.

The court has already determined that a de novo standard of review applies to plaintiff's benefits claims. Under this standard, the court evaluates whether the plan administrator correctly or incorrectly denied benefits. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). It is plaintiff's burden to show he falls under the provisions of the plans entitling

him to benefits.  <u>See Juliano v. Health Maintenance Organization of New Jersey, Inc.</u>, 221 F.3d 279, 287-8 (2nd Cir. 2000) (plaintiff's burden to establish entitlement to benefits).  To the extent defendants claim any exclusions under the plans, it is their burden to prove such exclusion.  <u>See Farley v. Benefit Trust Life Ins. Co.</u>, 979 F2.d 653, 658 (9th Cir. 1992) (contentions that losses are excluded by the plan is an affirmative defense).

Before addressing the claims argued at trial, the court resolves the outstanding motions as follows:  defendants motion to allow the filing of the supplemental declaration of Starla Piburn (#255) is granted; defendants' rule 60 motion for relief from order (#260) is denied; and defendants' motion to amend the pretrial order (#286) is granted with respect to the after acquired evidence defense and denied with respect to the qualified privilege defense. In addition, the motions in limine (#282 and #284) are denied without prejudice to revisit any issues, as necessary, for purposes of the jury portion of the case.


<u>A.</u>   <u>Retiree Medical Benefits</u>

Plaintiff argues that because he elected to exchange his sick leave balance, pursuant to the March 19, 1987 policy, for paid medical insurance benefits upon retirement and because he had an accrued sick leave balance of 97% upon his separation from CEC, that he is entitled to a 100% benefit payable at retirement age.

On January 15, 2001, CEC issued a memorandum reminding employees of the sick leave benefits including the payment of medical premiums upon retirement age for unused sick leave hours up to %100.

The 2004 revision to the retiree medical plan provided in part:

> All employees who, as of April 1, 2004, have unused accrued sick leave with a balance greater than 80% and less than 90% will receive 75% of their medical premium paid at the normal retirement age of 62, or such other age as may be stated in the retirement plan for that employee. All employees who, as of April 1, 2004, have unused accrued sick leave with a balance greater than 90% will receive 100% of their medical premium paid at the normal retirement age of 62, or such other age as may be stated in the retirement plan for that employee. Said medical premium payment shall continue for that employee for the balance of that employee's life.

At the time that plaintiff separated from employment with defendant, the medical policy defined "retiree" as

> an employee who is in a group of employees designated by the Participating Cooperative as eligible to participate in the Plan after retirement and who retires from a Participating Cooperative by ceasing all work as an employee of the Participating Cooperative and draws a retirement pension benefit from NRECA....

Plaintiff met this definition at the time he left employment with defendant.  On April 30, 2008, plaintiff demanded that his benefits, including his medical benefits be processed.  On May 2, 2008, CEC cancelled plaintiff's medical benefits, but did not provide formal notice until February 6, 2009.

Although plaintiff met the definition of retiree at the time he left employment, the plan also provides that CEC shall designate

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

the groups eligible to participate.  The summary plan description indicates that the Plan Administrator reserves the right to make changes to the plan or terminate the plan at any time, for any reason and that changes may be made without advance notice.  In addition the summary provided that rights to post-retirement benefits are subject to change.

Plaintiff argues that his right to the medical benefit vested on April 1, 2004, because he met all the requirements of the April 1 plan revision.  However, although plaintiff clearly met the requirements for eligibility even at the date of his separation from employment, the plan does not clearly provide the right to the benefit vested.  ERISA does not prohibit modification or termination of employee benefit plans.  In addition, ERISA does not require plans to vest.  See Grosz-Salomin v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1160 (9th Cir. 2001).

> Welfare benefits ... need never vest ....  Because of this, "[a]n employer ... may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits." [footnote omitted] Contractual vesting of a welfare benefit, moreover, "is an extra-ERISA commitment that must be stated in clear and express language."

Id. (quoting Chiles v. Ceridian Corp., 95 F.3d 1505, 1513 (10th Cir. 1996).

Plaintiff argues that because the elements for the  benefit are clearly expressed, he has a vested right to the benefit.  The evidence is insufficient for the court to find that the benefit

itself vested.   This conclusion is highlighted by the language permitting changes and the fact that during plaintiff's employment, terms were often modified, such as the revision in 2004.   However, simply because the plan administrator has the right to modify the plan, does not mean that plaintiff is not eligible for the benefit.

Defendants contend that even under the 2004 plan revision, plaintiff is not entitled to the benefit because it asserts a long-standing policy to interpret retirement as meaning an employee's departure from employment for a reason other than for cause.[1] However, the evidence presented by plaintiff sufficiently refutes such a policy.   Defendants presented evidence of board members who indicated that it was understood that termination for cause eliminated the retiree medical benefits. Defendants also presented evidence of other employees who had been terminated for cause and who did not receive the benefit at issue.   However, plaintiff has shown that either the employees did not meet the eligibility requirements under the 2004 plan or that the employees did not opt for the plan.   Accordingly, the evidence demonstrates that as of the time of plaintiff's separation from employment, plaintiff met the eligibility requirements for the retirement medical benefit. Moreover, the 2009 revision, while at fist glance appearing to modify the plan to eliminate the benefit as to plaintiff, assuming

---

[1]The issue of whether plaintiff was in fact terminated for cause due to dishonesty or misconduct must be left to a jury as it relates to other claims to be determined by a jury.

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

he had been properly terminated for cause, does not in fact so provide.

The January 23, 2009, revisions include that

Since the Retiree Medical Plan's inception, the terms "Retirement" or "Retire" have been interpreted to mean that the employee leaves employment with Central Electric Cooperative either voluntarily or involuntarily without cause and who, as of such termination date, is eligible for early or normal retirement benefits under the Retirement Plan. Accordingly, an employee whose employment with Central Electric Cooperative is terminated by the employer for cause including but not limited to dishonesty or misconduct is not eligible for any Retiree Medical Plan benefits.

Moreover, effective on or after February 1, 2009, any individual who previously Retired and was determined eligible to receive Retiree Medical Plan Benefits shall thereafter prospectively forfeit the right to receive such benefits if it is later determined by Central Electric Cooperative that the individual had committed acts of dishonesty or other misconduct with respect to Central Electric Cooperative that would have resulted in the individual's termination for cause of employment had such acts or other misconduct been discovered prior to the individual's Retirement date.

However, the revisions also include the statement that

nothing in the foregoing is intended to modify the Retiree Medical Plan document or any of its terms. In the event of any conflict between the foregoing and the Retiree Medical Plan's document, the document will control.

Because plaintiff has demonstrated that the term "retiree" had not been interpreted in such a manner prior to the June 23, 2009 revision, the term as it appears in the medical plan document controls and even if plaintiff had been terminated for cause, he still fell within that definition. Accordingly, plaintiff is

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

entitled to the retirement medical benefit.  CEC shall reimburse
plaintiff for all premiums that it has refused to pay from May 2,
2008 to date and shall reimburse plaintiff for any out-of-pocket
medical expenses that would have been covered had the medical
benefits not been terminated.

B.    Pension Restoration Plan

Plaintiff asserts that under the PRP he was owed approximately
$352,672, but that CEC schemed to reduce that amount to $16,472.75.
Although plaintiff's claim under the PRP falls under ERISA and was
a subject of the court trial, it necessarily involves issues that
must be determined by the jury with respect to plaintiff's
defamation claim.

In supplying information to NRECA in requesting a
recalculation of plaintiff's PRP benefit, CEC asserts that
plaintiff forged his title on CEC financial records by claiming to
be the president and CEO of CEC after he resigned that position.
Plaintiff's defamation claim includes an assertion that CEC defamed
him by claiming that he inflated his income.  There are two issues
with respect to the PRP claim that are inextricably intertwined
with the defamation claim: (1) whether plaintiff was an employee of
CEC Resources such that it was improper for him to include
compensation received from CEC Resources in payroll reports
submitted to NRECA; and (2) whether plaintiff's receipt and

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

reporting of salary at the level of president for calendar year 2007 on a report to NRECA was proper. Because of the risk of inconsistent findings by the court for the ERISA claim and the jury on the defamation claim, the court declines to rule on the PRP benefit until the jury makes its factual findings.

C.    MINT Plan

The issue for the court to decide at this stage, is whether the MINT plan contained a provision that no benefits shall apply to a participant terminated for cause. The court finds that the evidence establishes that it does contain such a clause.

Plaintiff contends that there are separate MINT plans for management and directors. Plaintiff's exhibit 74 indicates that there is no benefit forfeiture provision in an application for authorization, submitted March 22, 1989, for MINT plan participation for plaintiff and one other member of management staff. The application packet includes a form checking a box next to the no forfeiture statement and has a signature of former general manager Lane Powell. While the court has concerns about the authenticity of the exclusion of the benefit forfeiture option by Powell, Powell did not have the authority to exclude the option.

The CEC Board of Directors adopted a MINT plan on June 18, 1987. The court finds that defendant's Exhibit 831, though unsigned, is the MINT plan based on the Board minutes of June 18,

13 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1987 (Defendant's Exhibit 865).   The plan applies to management employees or directors who qualify.  The plan could only be amended by vote of the Board of Directors.

Although Powell was empowered to purchase MINT units and to implement the plan, he was not empowered to change plan terms.  The June 18, 1987 plan indicates that

> No benefits shall apply to a terminated Participant who
> is discharged from his employment with the Company on
> account of dishonesty or misconduct.

Issues regarding the eligibility of directors to participate in the MINT plan resulted in the Board adopting a MINT plan effective July 1, 1989.  Although the document has the heading "Management Incentive Plan for Directors," the Board minutes of August 17, 1989 indicate that the above plan was adopted to retain and reward highly qualified management personnel and directors. Eligible persons include individuals employed to perform management functions. The plan retains the language excluding participants terminated for dishonesty or misconduct.

Plaintiff does not provide sufficient evidence with respect to the MINT plan itself, adopted by the Board or amended by the Board, to exclude the forfeiture option.  Accordingly, the court finds such disqualification clause applies to plaintiff's participation in the MINT plan.  However, because the issue of whether plaintiff was appropriately terminated for cause is an issue reserved to a jury, the court cannot make a final ruling on the issue at this

time.

D.   Deferred Compensation Plan

Although defendants do not dispute that benefits under the deferred compensation plan were payable to plaintiff upon termination of employment, defendants withheld $31,000 of that amount for about nine months.  Plaintiff asserts entitlement to a nine percent interest rate without a cite to any authority. Defendants did pay interest on the amount withheld and plaintiff has not demonstrated the amount is below the amount prescribed by 28 U.S.C. § 1961.

E.   Interference and Retaliation

Plaintiff asserts that defendants interfered with his ability to collect benefits and retaliated against him for asking that his benefits be processed.

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan

29 U.S.C. § 1140.

Plaintiff, however, has failed to sufficiently establish interference or retaliation that impacted his employment relationship with CEC.  Plaintiff's claim is based on conduct that

15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

occurred after his employment ended and thus cannot form the basis

of a section 1140 claim.

> claims under § 1140 require, as a "fundamental
> prerequisite," an allegation that the parties'
> employer-employee relationship was "changed in some
> discriminatory or wrongful way." Deeming v. Am. Standard,
> Inc. 905 F.2d 1124, 1127 (7th Cir. 1990); cf. Lojek v.
> Thomas, 716 F.2d 675, 680 (9th Cir. 1983) ("ERISA's
> legislative history ... reveals that Congress was
> concerned with the acts of unscrupulous employers who
> discharged and harassed their employees in order to keep
> them from obtaining vested pension rights.").

Huntsinger v. Shaw Group, Inc., 410 F.Supp.2d 968, 975 (D.Or.

2006). The Huntsinger court found that any alleged discrimination

occurred after termination and thus did not effect the employment

relationship sufficiently to be actionable.

Although, plaintiff's claim very nearly falls within the

protections because of defendant's alleged underhanded efforts to

determine plaintiff's termination was for cause such that he would

not be entitled to benefits, the outcome to the employment

relationship was not effected because plaintiff had, in any event,

left the employment relationship.


F.    Penalties

Plaintiff seeks statutory penalties of $110 per day for

every day that defendants failed to provide plan documents and

reasons for denials beyond 30 days and 90 days, respectively, of

his request for documents and denials.

Any administrator (A) who fails to meet the requirements

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

of paragraph (1) or (4) of section 1166 of this title, section 1021(e)(1) of this title or section 1021(f), or section 1025(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1).[2]

The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination [setting forth the reasons and plan provisions relied upon].

29 C.F.R. § 2560.503-1(g).

[I]f a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. In no event shall such extension exceed a period of 90 days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the benefit determination.

---

[2]The ERISA implementing regulations increased the penalty from $100 a day to $110 a day effective for violations occurring after July 29, 1997.  29 C.F.R. § 2575.502c-1.

17 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

29 C.F.R. § 2560.503-1(f).

Plaintiff asserts that defendants failed to provide plan documents he requested on April 30, 2008, until December 24, 2008, January 9, 2009 and February 5, 2010.  Plaintiff seeks a total of $115,280 for these failures.  Plaintiff asserts that defendants failed to provide reasons for denials he requested on July 29, 2008, until June 15, 2009 and February 5, 2010.  Plaintiff seeks a total $111,980 for these failures.

Plaintiff's April 30, 2008 letter was insufficient to trigger the requirement to provide plan documents under 29 U.S.C. 1132©. Plaintiff's July 29, 2008 request did properly request the documents, but on August 4, 2008, plaintiff's counsel, for discovery purposes, canceled the request.  A discovery conference was held on September 2, 2008, and that is the appropriate date from which to calculate a need to respond.

Defendants did provide documents as early as October 16 and 17, 2008.[3]   The discovery issues in this case along with the confusion created by both parties over the requests and their timing deter the court from  exercising its discretion to award penalties related to the failure to timely produce documents.

Although defendants actions with respect to the denials reveal, to a certain extent, game playing, the court also declines

---

[3]These documents show that the plan administrator of the medical plan is NRECA and it is the entity required to produce the medical document, not defendants.

to exercise its discretion to award penalties for delays associated with notification of the reasons for denial even if such penalties can be imposed for violation of the regulation at issue.

In light of the above, the parties are requested to submit briefs as to whether partial judgment should be entered at this time or should await the outcome of the issues left for a jury to resolve.


<u>CONCLUSION</u>

For the reasons stated above, defendants' motion to allow the filing of the supplemental declaration of Starla Piburn (#255) is granted, defendants' rule 60 motion for relief from order (#260) is denied, defendants' motion to amend the pretrial order (#286) is granted in part, and the motions in limine (#282 and #284) are denied.  In addition, the court finds in favor of plaintiff on his claim for retiree medical benefits and for defendant on the claims for deferred compensation plan interest, interference and retaliation, and penalties.

DATED this 6th day of January, 2011.

                               <u>s/ Michael R. Hogan</u>
                               United States District Judge